**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| MASSAPEQUA UNION FREE SCHOOL DISTRICT, MASSAPEQUA UNION FREE SCHOOL DISTRICT BOARD OF EDUCATION,<br>Plaintiffs, | Case No. 2:25-cv-05892-JMA-ARL |
| v. | |
| BETTY A. ROSA, in her official capacity as Commissioner of Education, DENISE M. MIRANDA, in her official capacity as Commissioner of the New York State Division of Human Rights, LETITIA A. JAMES, in her official capacity as Attorney General of the State of New York, and JANE DOE and JOHN DOE on behalf of their minor daughter JANIE DOE, UNITED STATES DEPARTMENT OF EDUCATION, LINDA E. MCMAHON in her official capacity as United States Secretary of Education,<br>Defendants. | **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER & PRELIMINARY INJUNCTION** |

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

STATEMENT OF FACTS ..... 3

I. The Board of Education's Resolutions ..... 3

II. Federal Enforcement Actions ..... 3

III. The Commissioner's Response ..... 4

IV. The Commissioner's Stay Order and Final Order ..... 4

V. Harm to Students ..... 5

VI. The DOJ Letter ..... 6

LEGAL STANDARD ..... 6

ARGUMENT ..... 7

I. Plaintiffs Are Likely To Succeed On The Merits ..... 7

A. The Court Has Subject Matter Jurisdiction ..... 7

B. The District Has Capacity to Sue ..... 7

C. Conflict preemption applies where a state forbids conduct that federal law authorizes or disturbs the careful balance struck by federal law ..... 9

1. Permission preemption ..... 9

2. Disturbing the federal government's deliberate policy choice ..... 10

D. Plaintiffs Have Not Delayed - Receipt of DOJ's Recent August 20th Letter Crystallized The Conflict ..... 10

E. Title IX & Its Implementing Regulations Preempt the Order Because They Authorize Schools to Segregate Intimate Facilities on the Basis of Biological Sex ..... 11

F. The Order conflicts with Title IX and its implementing regulations because it disturbs the careful balance federal law struck. ..... 14

II. Plaintiffs Will Suffer Irreparable Harm Absent a Temporary Restraining Order ..... 15

A. Legal Standard ..... 16

B. Compliance With the Commissioner's Order Will Violate Title IX and Threaten the District's Federal Funding ..... 16

1. Federal Enforcement Against Districts With "Gender Identity" Policies Is Already Underway ..... 17

2. The Funding at Stake Feeds the District's Students and Supports Students with Disabilities ..... 18

C. The District Faces an Impossible Choice: Lose Federal Funding or Lose State Funding 19

D. Loss of State Funds Cannot Be Restored Under Any Circumstances .............................. 20

1. Soverign Immunity Forecloses Recovering Improperly Witheld Funds From New York State .............................................................................................................................. 20

2. New York Law Forecloses Every Means of Replacing the Funds ............................... 20

III. The Balance of the Equities and the Public Interest Favor Relief. .................................. 21

a. The Injunction Restores the Status Quo............................................................................ 21

b. Denying Emergency Relief Would Subject Girls to the Violation of a Fundamental Constitutional Right. ........................................................................................................... 21

c. The Record Confirms That Denying Relief Will Cause Irreversible Harm to the District's Students ............................................................................................................................... 22

d. The Public Interest Favors Compliance with Federal Law.............................................. 21

IV. This Court Should Exercise Its Discretion to Waive FRCP 65(c)'s Security Requirement. 24

NOTICE ......................................................................................................................................... 24

CONCLUSION.............................................................................................................................. 25

## TABLE OF AUTHORITIES

**Cases**

*Adams v. Sch. Bd. of St. Johns Cty.*,
57 F.4th 791 (11th Cir. 2022) ....................12, 13, 15, 16

*Agudath Isr. of Am. v. Cuomo*,
983 F.3d 620 (2d Cir. 2020) ....................6

*Alessi v. Raybestos-Manhattan, Inc.*,
451 U.S. 504 (1981) ....................10

*Appeal of Student With A Disability*,
Dec. No. 16,954 (2016) ....................5

*Arizona v. United States*,
567 U.S. 387 (2012) ....................10

*Barnett Bank of Marion County, N.A. v. Nelson*,
517 U.S. 25 (1996) ....................10

*Brannum v. Overton Cnty. Sch. Bd.*,
516 F.3d 489 (6th Cir. 2008) ....................21, 22

*Branson Sch. Dist. RE-82 v. Romer*,
161 F.3d 619 (10th Cir. 1998) ....................7

*Cantero v. Bank of Am., N.A.*,
602 U.S. 205 (2024) ....................10

*Carcano v. McCrory*,
203 F. Supp. 3d 615 (M.D.N.C. 2016) ....................22

*Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*,
450 U.S. 311 (1981) ....................9, 10

*City of N.Y. v. State of N.Y.*,
86 N.Y.2d 286 (1995) ....................9

*Clarke v. Town of Newburgh*,
45 N.Y.3d 428 (2025) ....................7, 8

*County of Santa Clara v. Trump*,
250 F. Supp. 3d 497 (N.D. Cal. 2017) ....................19

*County of Rensselaer v. Regan*,
80 N.Y.2d 988 (1992) ....................9

*Doctor's Assocs., Inc. v. Distajo*,
107 F.3d 126 (2d Cir. 1997) ....................24

*Edelman v. Jordan*,
415 U.S. 651 (1974) ....................20

*Edgar v. Mite Corp.*,
457 U.S. 624 (1982) ....................10, 14

*Ex parte Young*,
209 U.S. 123 (1908) ....................7, 20

*Faiveley Transp. Malmo AB v. Wabtec Corp.*,
559 F.3d 110 (2d Cir. 2009) ....................16

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
458 U.S. 141 (1982) ....................10, 11

*Gomillion v. Lightfoot*,
364 U.S. 339 (1960) ....................7, 8

*Grimm v. Gloucester Cty. Sch. Bd.*,
972 F.3d 586 (4th Cir. 2020) ....................12, 13

*Kansas v. Garcia*,
589 U.S. 191 (2020) ....................9

*Kansas v United States Dept. of Educ.*,
739 F. Supp 3d 902 (D. Kan 2024) ....................11, 22

*Lawrence County v. Lead-Deadwood School Dist. No. 40-1*
469 U.S. 256 (1985) ....................10

*Leaders of a Beautiful Struggle v. Balt. Police Dep't*,
2 F.4th 330 (4th Cir. 2021) ....................22

*Louisiana v. United States Dep't of Educ.*,
737 F. Supp. 3d 377 (W.D. La. 2024) ....................15

*Massapequa Union Free School Dist. v. New York State Bd. of Regents*,
809 F. Supp. 3d 33 (E.D.N.Y. 2025) ....................8

*Metro. Transp. Auth. v. Duffy*,
784 F. Supp. 3d 624 (S.D.N.Y. 2025) ....................16, 19

*Murphy v. Nat'l Collegiate Ath. Ass'n*,
584 U.S. 453 (2018) ....................9

*MyWebGrocer, L.L.C. v. Hometown Info., Inc.*,
375 F.3d 190 (2d Cir. 2004) ....................21

*New York v. U.S. Dep't of Homeland Sec.*,
969 F.3d 42 (2d Cir. 2020) ....................21

*Nken v. Holder*,
556 U.S. 418 (2009) ....................................................................................................7

*Oneok, Inc. v. Learjet, Inc.*,
575 U.S. 373 (2015) ....................................................................................................9

*People v. Kin Kan*,
78 N.Y.2d 54 (1991) ....................................................................................................8

*Planned Parenthood of N.Y.C. v. U.S. Dep't of Health & Hum. Servs.*,
337 F. Supp. 3d 308 (S.D.N.Y. 2018) ....................................................................23, 24

*Roe v. Critchfield*,
No. 23-2807, slip op., (9th Cir. Mar. 20, 2025) ..........................................................22

*Tennessee v. Cardona*,
737 F. Supp. 3d 510 (E.D. Ky. 2024) ....................................................12, 15, 18, 22

*Thunder Basin Coal Co. v. Reich*,
510 U.S. 200 (1994) ..................................................................................................18

*Tweed-New Haven Airport Auth. v. Tong*,
930 F.3d 65 (2d Cir. 2019) ........................................................................................7, 8

*United States v. Virginia*,
518 U.S. 515 (1996) ..................................................................................................12

*Univ. of Tex. v. Camenisch*,
451 U.S. 390 (1981) ..................................................................................................21

*Velesaca v. Decker*,
458 F. Supp. 3d 224 (S.D.N.Y. 2020) ..........................................................................23

*Vernonia Sch. Dist. 47J v. Acton*,
515 U.S. 646 (1995) ..................................................................................................22

*We the Patriots USA, Inc. v. Hochul*,
17 F.4th 266 (2d Cir. 2021) ......................................................................................6, 7

*West Virginia v. B.P.J.*,
146 S. Ct. 2356 (2026) ....................................................................................14, 15, 22

*Williams v. Marinelli*,
987 F.3d 188 (2d Cir. 2021) ......................................................................................2, 9

*Winter v. Nat. Res. Def. Council*,
555 U.S. 7 (2008) ....................................................................................................6, 16

*York v. Story*,
324 F.2d 450 (9th Cir. 1963) ......................................................................................22

**Constitutions**

U.S. Const. art. VI, cl. 2 ........................................9

**Statutes**

20 U.S.C. § 1413 ........................................21

20 U.S.C. § 1681 ........................................1, 3

20 U.S.C. § 1682 ........................................18

Education Law § 1718 ........................................20

Education Law § 2023 ........................................20

Education Law § 4402 ........................................21

Education Law § 3651 ........................................20

Gen. Mun. Law § 6 ........................................20

Real Property Tax Law § 1318 ........................................20

**Regulations**

34 C.F.R. § 106.33 ........................................1, 2, 3, 12, 14, 15

34 C.F.R. § 106.44 ........................................14

34 C.F.R. § 300.203 ........................................21

34 C.F.R. § 300.204 ........................................21

34 C.F.R. § 300.205 ........................................21

**Other**

Board Meeting, Oct. 9, 2025, https://www.youtube.com/watch?v=qDDQ0osUdA4 ........................................23

Board Meeting, Oct. 21, 2025, https://www.youtube.com/watch?v=8Sptag9_Yd8&t=4507s ........................................6

H.R. Res. 1058, 119th Cong. (2026) (recognizing a duty to implement a "Transgender Bill of Rights") ........................................15

Reem Alsalem, S*pecial Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325 ........................................13

Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975 ........................................12

*Student Nondiscrimination Act*, H.R. 4530, 111th Cong. (2010) ........................................15

*Student Nondiscrimination Act*, S. 3390, 111th Cong. (2010) ......................................................15

U.S. Dep't of Educ., Office for Civil Rights, *Equal Opportunity in Intercollegiate Athletics: Requirements Under Title IX of the Education Amendments of 1972*, https://www.ed.gov/laws-and-policy/civil-rights-laws/title-ix-and-sex-discrimination/title-ix-key-issues/title-ix-and-athletics/equal-opportunity-intercollegiate-athletics-requirements-under ....................................12

W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 229 (2019) .......................................................12

## PRELIMINARY STATEMENT

This case presents a constitutional crisis manufactured by state officials and thrust upon a local school board. Plaintiffs, the Massapequa Union Free School District (the "District") and its Board of Education, face two irreconcilable government commands. On one side, Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 *et seq.*) and its implementing regulation, 34 C.F.R. § 106.33, expressly permit federally funded schools like the District to maintain sex-segregated restrooms and locker rooms based on biological sex, giving them flexibility to respond to sex-based discrimination. As enforced by the United States Departments of Education and Justice against school districts throughout the country, including in New York State, Title IX supersedes contrary state laws. On the other, New York State Education Commissioner Betty A. Rosa has ordered Plaintiffs, under threat of enforcement, to "allow all students to access the school facilities, including bathrooms and locker rooms, that most closely align with their gender identity," regardless of biological sex. Supp. Am. Compl. ¶ 10. These directives cannot coexist. Without emergency relief from this Court, Plaintiffs will be forced to violate one sovereign's command to satisfy the other and face enforcement whichever command they follow.

As the school doors are set to open, the consequences are imminent. Complying with the Commissioner's order risks the District's federal funding for critical programs, including the Food Service Program and Individualized Education Programs. The Department of Education's Office for Civil Rights has already opened Title IX investigations into other New York school districts. Enforcing the District's facially neutral, biologically based facilities policy in accordance with federal law, however, risks state "enforcement actions" by the Commissioner. Either course endangers funding the District cannot operate without, and no after-the-fact monetary relief can restore those funds.

The harm extends beyond the balance sheet. The Commissioner's order forces adolescent girls to undress, use restrooms, and attend to intimate bodily needs alongside biological males, threatening their rights to privacy and a safe educational environment.

The law favors Plaintiffs. The Commissioner's order is preempted under the Supremacy Clause. Title IX expressly permits recipients of federal funding to "provide separate toilet, locker room, and shower facilities on the basis of sex." 34 C.F.R. § 106.33. The order forbids what federal law authorizes, compelling the District to open biologically sex-segregated facilities to students of the opposite biological sex. That is textbook conflict preemption, which applies not only to state statutes but also to actions by state executive-branch officials such as the Commissioner. *See Williams v. Marinelli*, 987 F.3d 188, 198 (2d Cir. 2021).

On August 20, 2026, the federal government confirmed as much. In a letter to Plaintiffs' counsel, the United States Attorney for the Eastern District of New York and the Department of Justice stated that Title IX's use of "'sex' means biological sex, and it does not include or extend to gender identity," that biological males entering girls' intimate spaces "harms girls and accordingly violates Title IX," and that "[p]ursuant to the Supremacy Clause . . . Title IX would preempt any state or local law or regulation that directly conflicts with Title IX." Rigano Decl. Ex. H at 2-3. The DOJ's position reflects the federal government's enforcement posture and confirms that the Commissioner's order places the District in direct conflict with federally authorized conduct. The letter prompted the District's motion for interim relief.

Plaintiffs therefore ask this Court for a temporary restraining order and a preliminary injunction so that the local school board and the children it serves are not punished by State Defendants for obeying federal law. Plaintiffs' requested relief is narrow. Plaintiffs do not ask this Court to review the Commissioner's application of the Education Law, disturb her resolution of

the state-law questions committed to her, or enter relief against the Does. Plaintiffs ask only that the State Defendants be enjoined, pending resolution of this action, from taking enforcement action against the District for maintaining the sex-separated intimate facilities that 34 C.F.R. § 106.33 expressly permits.

That relief turns on a question the Commissioner lacked authority to answer. As a state administrative officer, she could not decide whether federal law preempts the state rules she enforces—a federal question reserved for an Article III court. She acknowledged as much by declining to reach "the constitutional issues under the Supremacy Clause." Supp. Am. Compl. ¶ 78. Her statement in the Order that "there is nothing in Title IX . . . that conflicts with the State laws that are within [her] purview to enforce," *id*., therefore resolves nothing and binds no one. Plaintiffs ask this Court not to second-guess the state adjudicator, but to resolve the federal question she could not reach.

## STATEMENT OF FACTS

### I. The Board of Education's Resolutions

On September 9, 2025, the Board of Education ("BOE") for the District adopted a facially neutral resolution requiring "all students . . . to use facilities—including restrooms and locker rooms—that correspond with the students' sex as defined under Title IX and federal law." Supp. Am. Compl.¶ 29. On September 18, 2025, the BOE adopted a second resolution directing the Superintendent to enforce the policy (the "Resolutions"). *Id.* at 34.

### II. Federal Enforcement Actions

The District accepts federal funding, so it is obligated to comply with Title IX. *See* 20 U.S.C. 1681(a); Ruf Decl. ¶ 2. USDOE's Office for Civil Rights ("OCR") has opened investigations into multiple New York school districts for Title IX violations based on gender-

identity bathroom policies. *See* https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-initiates-18-title-ix-investigations; *see also* https://www.ed.gov/about/news/press-release/us-department-of-education-finds-five-northern-virginia-school-districts-violation-of-title-ix; https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-launches-title-ix-investigation-saratoga-springs-city-school-district; https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-finds-denver-public-schools-violated-title-ix; https://www.ed.gov/about/news/press-release/us-department-of-education-launches-investigations-four-kansas-school-districts-alleged-title-ix-ferpa-violations.

## III. The Commissioner's Response

On September 24, 2025, the Commissioner sent a letter to the President of the District asserting that the District "violate[d] state laws," that "[t]here is no federal law to the contrary," and warning that "enforcement actions may result." Supp. Am. Compl. ¶¶ 8, 39. The letter cited no statutory authority, only the Commissioner's own February 2025 joint statement with the Attorney General. *Id.* ¶ 40.

The Commissioner's office forwarded that letter *ex parte* to the New York Civil Liberties Union ("NYCLU"), which then filed an appeal of the Resolutions *before the Commissioner* on behalf of the Does (the "Doe Proceeding"). Supp. Am. Compl. ¶¶ 51-54.

## IV. The Commissioner's Stay Order and Final Order

On October 14, 2025, the Commissioner entered a stay order in the Doe Proceeding, staying the Resolutions and requiring Plaintiffs to allow biological males to enter intimate spaces with biological females. Supp. Am. Compl. ¶¶ 56-57. The stay order in conclusory form declared

that "[s]tate law and guidance on the rights of transgender individuals is unequivocal" and that federal authority "relied upon by respondent [is] inapposite." *Id.* ¶ 57.

On October 21, 2025, Plaintiffs filed a Complaint with this court primarily arguing that New York's prohibition on sex-separated intimate facilities is federally preempted by Title IX. Compl. ¶¶ 4-5.

On April 20, 2026, the Commissioner issued her final decision (the "Order") annulling the Resolutions and ordering the District to "allow all students to access the school facilities, including bathrooms and locker rooms, that most closely align with their gender identity." Supp. Am. Compl. ¶ 74; Rigano Decl. Ex. G. Because she had no jurisdiction to do so, the Commissioner elected not to address Plaintiffs' Title IX preemption argument, stating that "I need not address constitutional issues under the Supremacy Clause." *Id.* at 78; *Appeal of Student With A Disability*, Dec. No. 16,954 (2016) ("I note that an appeal to the Commissioner is not the proper forum to adjudicate novel issues of constitutional law or to challenge the constitutionality of a statute or regulation . . . A novel claim of constitutional dimension should properly be presented to a court of competent jurisdiction.").

On August 20, 2026, Plaintiffs filed a Supplemental Amended Complaint incorporating the Order. Supp. Am. Compl. ¶¶ 14, 20, 74-78.

## V. Harm to Students

At the start of the 2025-2026 school year, Plaintiffs learned of several incidents in which biological males entered the girls' bathrooms, and female students complained of harassment and invasions of privacy. Wachter Decl. ¶ 7; Supp. Am. Compl. ¶ 81. After the Resolutions were enacted, the incidents stopped. *Id.* at 83. Following Commissioner Rosa's stay order, a biological

male used the girls' bathroom, prompting additional complaints. *Id.* at 84*; see* Board Meeting, Oct. 21, 2025, at 1:06:56–1:10:23, https://www.youtube.com/watch?v=8Sptag9_Yd8&t=4507s.

Because Janie Doe will start at a new District school in 2026-2027, absent emergency relief, a new population of girls will be required to share intimate spaces with a biological male. Supp. Am. Compl. ¶ 24. Every District school, including the high school Janie Doe will attend, has single-user, gender-neutral restrooms throughout the building. Wachter Decl. ¶¶ 3-5; Supp. Am. Compl. ¶¶ 44-45. Any student who prefers not to use the multi-user facility corresponding to his or her biological sex, including Janie Doe, may use a private facility instead. *Id.* The Resolutions therefore deny no student the use of a restroom; they preserve sex-separated multi-user facilities while offering a private alternative to every student who wants one.

**VI. The DOJ Letter**

On August 20, 2026, the DOJ sent Plaintiffs' counsel a letter stating that Title IX defines "sex" as biological sex, and it does not include or extend to gender identity," that biological males "enter[ing] intimate space[s] designated for girls harms girls and accordingly violates Title IX," and that "[p]ursuant to the Supremacy Clause . . . Title IX would preempt any state or local law or regulation that directly conflicts with Title IX." Rigano Decl. Ex. H at 2-3. On August 24, 2026, Plaintiffs voluntarily dismissed their claims against the federal defendants.

**LEGAL STANDARD**

A temporary restraining order or preliminary injunction is warranted when plaintiffs establish (1) a likelihood of success on the merits, (2) likely irreparable harm absent preliminary relief, (3) that the balance of equities favors them, and (4) that an injunction is in the public interest. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Agudath Isr. of Am. v. Cuomo*, 983 F.3d 620, 631 (2d Cir. 2020). The latter two equitable factors "merge" when the government is the

opposing party. *We the Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021) (per curiam); *cf. Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I. Plaintiffs Are Likely To Succeed On The Merits

#### A. The Court Has Subject Matter Jurisdiction

Plaintiffs' claims against Commissioner Rosa, Commissioner Miranda, and Attorney General James are brought against those officials in their official capacities and seek only prospective declaratory and injunctive relief against an ongoing violation of federal law (Title IX). Such relief is not barred by the Eleventh Amendment. *Ex parte Young*, 209 U.S. 123 (1908). Plaintiffs seek no retrospective relief and no monetary relief from the State or its officials.

#### B. The District Has Capacity to Sue

Under the Supremacy Clause, a "subdivision may sue its state." *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 73 (2d Cir. 2019). *Tong* explained that the view that subdivisions broadly cannot sue states was "put to rest" by *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), and that states may not enforce laws preempted by federal law; Supremacy Clause suits help prevent that result. *Id.* at 72–73; *see also Branson Sch. Dist. RE-82 v. Romer*, 161 F.3d 619, 628–29 (10th Cir. 1998). The *Tong* court further quoted the Supreme Court: "Legislative control of municipalities, no less than other state power, lies within the scope of relevant limitations imposed by the United States Constitution." 930 F.3d at 73.

Defendants may rely on *Clarke v. Town of Newburgh*, 45 N.Y.3d 428 (2025), to argue that the District lacks capacity under Rule 17(b). But *Clarke* is inapposite for four reasons.

First, in *Clarke* the Plaintiff asserted a preemption claim based on the Fourteenth Amendment. *Id.* at 437 (plaintiff contended that "any compliance with the NYVRA would force

it to violate the Equal Protection Clauses of the U.S. and New York Constitutions."). The parties there did not cite, and the court did not consider, *Tong*. That is because *Tong* "did not disturb prior Second Circuit caselaw that a municipal entity may not sue its state to vindicate its own rights under the Fourteenth Amendment." *Massapequa Union Free School Dist. v. New York State Bd. of Regents*, 809 F. Supp. 3d 33, 64 n.13 (E.D.N.Y. 2025). *Tong*'s holding was inapplicable in *Clarke* because it is well settled that the Fourteenth Amendment cannot be the basis for Supremacy Clause capacity. Here, by contrast, the Fourteenth Amendment is not at issue.

Second, unlike Plaintiffs here, Newburgh faced no threat of federal enforcement, it merely speculated about undefined future liability. *Clarke*, 45 N.Y. 3d at 438-39. The *Clarke* court found this material in dismissing the claims. *Id.* at 439-40. Here, the District faces active federal enforcement: USDOE has opened investigations into New York school districts on this precise issue, and the DOJ has issued a letter to Plaintiffs' counsel confirming that compliance with the Order would violate Title IX. Rigano Decl. Ex. H.

Third, *Newburgh* sought to facially invalidate a statute, a posture in which municipal capacity was at its "lowest ebb." *Id.* at 438. The District, by contrast, does not seek to invalidate a statute but instead brings an as-applied challenge to the Commissioner's Order , which "placed the particular municipality in an allegedly untenable position." *Id.*

Finally, interpreting *Clarke* to dispense with Supremacy Clause capacity confirmed by the United States Supreme Court and the Second Circuit is incompatible with the basic architecture of federalism. Reliance on *Gomillion* and *Tong* does not conflict with Rule 17(b)'s directive to look to state law on capacity, because New York courts look to United States Supreme Court decisions as binding precedent and Second Circuit decisions as persuasive authority. *See People v. Kin Kan*, 78 N.Y.2d 54, 60 (1991).

Independently, the District has capacity because compliance with the Commissioner's Order risks Plaintiffs' "proprietary interest" in federal funding. *See City of N.Y. v. State of N.Y.*, 86 N.Y.2d 286, 291-92 (1995); *County of Rensselaer v. Regan*, 80 N.Y.2d 988, 989 (1992). If a recipient of federal assistance is found to have discriminated, the federal agency may initiate fund termination proceedings or refer the matter to DOJ for legal action. *See* https://www.justice.gov/crt/fcs/TitleVI. The District's federal funding is therefore a cognizable proprietary interest that independently confers capacity to sue.

### C. Conflict preemption applies where a state forbids conduct that federal law authorizes or disturbs the careful balance struck by federal law

The Supremacy Clause provides that federal law must "be the supreme Law of the Land . . ., any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. Under *Kansas v. Garcia*, "[i]f federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law,' 'the federal law takes precedence and the state law is preempted.'" 589 U.S. 191, 202 (2020) (quoting *Murphy v. Nat'l Collegiate Ath. Ass'n*, 584 U.S. 453, 477 (2018)). Preemption can invalidate not only state statutes but also actions by state executive-branch officials that conflict with federal law. *Marinelli*, 987 F.3d at 198. Conflict exists where "compliance with both state and federal law is impossible, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives" of federal law. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 377 (2015) (cleaned up).

#### 1. Permission preemption

The Supreme Court has repeatedly held that a state cannot prohibit entities from doing what a federal act or regulation has "authorized them to do" when the federal government intended to give them flexibility to achieve regulatory objectives. *Chicago & N.W. Transp. Co. v. Kalo Brick*

*& Tile Co.*, 450 U.S. 311, 318 (1981); *see also Alessi v. Raybestos-Manhattan, Inc.*, 451 U.S. 504, 524 (1981); *Lawrence County v. Lead-Deadwood School Dist. No. 40-1*, 469 U.S. 256 (1985); *Barnett Bank of Marion County, N.A. v. Nelson*, 517 U.S. 25, 31 (1996).

The Supreme Court's decision in *de la Cuesta* illustrates the point. A federal regulation permitted savings and loan associations to use "due-on-sale" clauses, while California law made them unenforceable. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 144, 149 (1982). The Court held that state law was preempted because it "forb[ade] a federal savings and loan to enforce a due-on-sale clause solely 'at its option' and . . . deprived the lender of the 'flexibility' given it by the Board." *Id.* at 155. California thus eliminated a federally authorized option and interfered with the flexibility federal law gave the lenders. *Cantero v. Bank of Am., N.A.*, 602 U.S. 205, 217 (2024).

#### 2. Disturbing the federal government's deliberate policy choice

State law also stands as an obstacle when it "upset[s] the careful balance struck by Congress." *Edgar v. Mite Corp.*, 457 U.S. 624, 634 (1982). The Supreme Court, for example, invalidated a state law criminalizing unauthorized alien employment because Congress "made a deliberate choice not to impose criminal penalties" in light of competing policy goals. *Arizona v. United States*, 567 U.S. 387, 405 (2012). When federal law reflects "a considered judgment," state law cannot alter that balance. *Id.*

### D. Plaintiffs Have Not Delayed - Receipt of DOJ's Recent August 20th Letter Crystallized The Conflict

The State may argue that Plaintiffs sat on their rights, but the chronology says otherwise. Plaintiffs moved as circumstances warranted; those circumstances became emergent only in the last two weeks.

The federal side of the District's predicament crystallized on August 20, 2026. Before then, the District knew that the United States was investigating and penalizing other districts for the policy the Order compels but lacked a written federal statement addressed to it. The DOJ's letter changed that: it stated that Title IX defines "sex" as biological sex, that allowing boys into girls' intimate spaces violates Title IX, and that Title IX would preempt any conflicting state or local law or regulation. Rigano Decl. Ex. H at 2-3. Plaintiffs voluntarily dismissed the federal defendants on August 24, 2026, *see* ECF No. 48, and filed this application as soon as possible.

### E. Title IX & Its Implementing Regulations Preempt the Order Because They Authorize Schools to Segregate Intimate Facilities on the Basis of Biological Sex

Federal law forbids states from eliminating flexibility it gives regulated entities, but the Commissioner did just that. The Order requires the District to "allow all students to access the school facilities, including bathrooms and locker rooms, that most closely align with their gender identity" and annulled the District's policies separating intimate facilities by biological sex. Supp. Am. Compl. ¶ 10. Title IX and its implementing regulations provide:

> A recipient [i.e., a school that receives federal funding] *may provide separate toilet, locker room, and shower facilities on the basis of sex*, but such facilities provided for students of one sex shall be comparable to such facilities provided for students of the other sex.

34 C.F.R. § 106.33 (emphasis added). Therefore, where state law forbids, federal law permits.[1] Federal law authorizes recipients to segregate on the basis of sex to preserve a school's flexibility to combat sex-based discrimination—the key objective of Title IX—in extenuating circumstances. *See Kansas v. United States Dept. of Educ.*, 739 F. Supp 3d 902, 923 (D. Kan 2024) (discussing Congress's Title IX goals as including protecting biological women in education). The

[1] "Federal regulations have no less pre-emptive effect than federal statutes." *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982).

promulgating agency likewise explains that "[t]he regulation (34 C.F.R. Part 106) implementing Title IX . . . permits individual institutions considerable flexibility in achieving compliance with the law." U.S. Dep't of Educ., Office for Civil Rights, *Equal Opportunity in Intercollegiate Athletics: Requirements Under Title IX of the Education Amendments of 1972*, https://www.ed.gov/laws-and-policy/civil-rights-laws/title-ix-and-sex-discrimination/title-ix-key-issues/title-ix-and-athletics/equal-opportunity-intercollegiate-athletics-requirements-under.

That flexibility is critical to preventing sex-based harm. When biological males and females share intimate facilities where students are partially or completely undressed for personal hygiene, students face an inherent risk of bodily-privacy violations from the opposite sex—and threats to their safety. *See Tennessee v. Cardona*, 737 F. Supp. 3d 510, 562 (E.D. Ky. 2024) (recognizing that "the risk of 'inappropriate sexual behavior' toward other students would certainly be heightened" if schools could not provide separate restrooms, locker rooms, and shower facilities to each sex). The "notion that the protection of individual privacy will occasionally require some segregation between the sexes is beyond doubt." *Adams v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791, 804 (11th Cir. 2022) (en banc).[2] As Ruth Bader Ginsburg noted, "[s]eparate places to disrobe, sleep, [and] perform personal bodily functions are permitted, *in some situations required*, by regard for individual privacy." Ruth Bader Ginsburg, *The Fear of the Equal Rights Amendment*, Wash. Post, Apr. 7, 1975, at A21 (emphasis added); *see also United States v. Virginia*, 518 U.S. 515, 550 n.19 (1996) ("Admitting women to VMI would undoubtedly require alterations necessary to afford members of each sex privacy from the other sex in living arrangements[.]"). Finally, "the

[2] Reflecting that these privacy concerns require attention in some contexts, "it has been commonplace and universally accepted—across societies and throughout history—to separate on the basis of sex those public restrooms, locker rooms, and shower facilities that are designed to be used by multiple people at a time." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 634 (4th Cir. 2020) (Niemeyer, J., dissenting). In fact, "sex-separation in bathrooms dates back to ancient times, and, in the United States, preceded the nation's founding." W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. & Pol'y Rev. 227, 229 (2019).

physical differences between males and females and the resulting need for privacy is what the exceptions in Title IX are all about." *Grimm v. Gloucester Cty. Sch. Bd.*, 972 F.3d 586, 634 (4th Cir. 2020) (Niemeyer, J., dissenting).

Moreover, privacy and safety harms disproportionately affect women, underscoring the need to preserve schools' option to maintain sex-separated facilities. The U.S. Department of Education has explained that evidence shows that "requiring teenage girls to undress or use the bathroom in the presence of teenage boys, causes distress in teenage girls, violates their right to privacy, and can deny girls equal access to benefits of educational programs and activities." Letter from Office for Civil Rights, U.S. Dep't of Educ. to Cal. Interscholastic Fed'n & Cal. Dep't of Educ., OCR Docket Nos. 10256902 & 09258901, at 13 (June 25, 2025), https://ocrcas.ed.gov/sites/default/files/ocr-letters-and-agreements/09258901-a.pdf (citing Reem Alsalem, S*pecial Rapporteur on Violence Against Women and Girls, Its Causes and Consequences*, U.N. Doc. A/79/325 at 5/24 (August 27, 2024), https://docs.un.org/en/A/79/325). The same United Nations report also suggests that "policies denying female students sex-separated intimate facilities increases the risk of sexual harassment, assault, voyeurism, and physical and sexual attacks in unisex locker rooms and toilets." *Id.*

These concerns are heightened in high schools because minors "are still developing, both emotionally and physically," *Adams*, 57 F.4th at 804. Federal law therefore preserves schools' ability to respond to such intrusions by allowing policymakers closest to local conditions to separate bathrooms and locker rooms by sex when necessary. *See* 34 C.F.R. § 106.33. The United States has since initiated enforcement actions when schools fail to provide sex-separated facilities under conditions presenting a demonstrable risk of sex-based harm. *See* Rigano Decl. Ex. H at 2 (citing *United States v. Maine Dep't of Educ.*, No. 25cv173 (D. Me. April 16, 2025); *United States*

*v. Cal. Interscholastic Federation*, No. 8:25cv1485 (C.D. Cal. July 9, 2025); *United States v. Minnesota Dep't of Educ.*, No. 26cv2078 (D. Minn. March 30, 2026)). Federal law also requires "[a] recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent." 34 C.F.R. § 106.44 (2020).

In response to this lawsuit, the United States told Plaintiffs that allowing boys, including trans-identifying boys, to enter intimate spaces designated for girls violates Title IX. Rigano Decl. Ex. H at 2. That statement strongly suggests that Massapequa's failure to exercise its authority under § 106.33 would constitute impermissible sex discrimination and confirms that the regulation's flexibility to separate sexes in sensitive spaces is critical to Title IX's objective of rooting out sex-based discrimination in schools.

Plaintiffs are therefore likely to prove that the Order, which eliminated a federally authorized option necessary to prevent sex-based discrimination, is preempted.

### F. The Order Conflicts with Title IX and its Implementing Regulations Because it Disturbs the Careful Balance Federal Law Struck.

The Order is preempted for another reason. It "upset[s] the careful balance struck by" the federal government and therefore impermissibly frustrates federal law. *Edgar*, 457 U.S. at 634.

The Order requires schools to prioritize gender identity over biological sex, disturbing Congress's choice of protected characteristics. Title IX and its implementing regulations prohibit discrimination on the basis of biological sex, not gender identity. The Supreme Court recently made that point in the context of athletics: "[t]he term 'sex' in the 1972 Title IX statute, the 1974 Javits Amendment, and the 1975 Title IX regulations cannot plausibly be interpreted to refer to

anything other than biological sex." *West Virginia v. B.P.J.*, 146 S. Ct. 2356, 2371 (2026).[3] Congress has not added gender identity to the list of protected characteristics despite legislative efforts. *See, e.g.*, *Student Nondiscrimination Act*, H.R. 4530, 111th Cong. (2010) (introduced by Rep. Polis); *Student Nondiscrimination Act*, S. 3390, 111th Cong. (2010) (introduced by Sen. Franken); H.R. Res. 1058, 119th Cong. (2026) (recognizing a duty to implement a "Transgender Bill of Rights").

That choice was intentional. Congress resolved the tension between privacy concerns and gender identity by protecting sex-based classification. Courts have concluded that eliminating sex-separate bathrooms "render[s] the purpose of [Title IX] obsolete in terms of the privacy interests Congress sought to protect." *Tennessee*, 737 F. Supp. 3d at 559; *see Louisiana v. United States Dep't of Educ.*, 737 F. Supp. 3d 377, 399 (W.D. La. 2024); *Adams*, 57 F.4th at 814. The Order thus upsets the careful balance struck by the federal government.

## II. Plaintiffs Will Suffer Irreparable Harm Absent a Temporary Restraining Order

The school year begins on September 2, 2026. On that day, the Order will force the District to open girls' locker rooms to biological males, exposing it to the loss of millions of dollars in federal education funding. Refusing to comply risks its state aid. No later remedy can adequately restore either source of funding if the District must cut educational programming, school lunches, or staff.

[3] *West Virginia*'s holding confirms that the Commissioner was incorrect when she stated that "there is nothing in Title IX, its implementing regulations, or the executive orders relied on by respondents that conflicts with the State laws that are within my purview to enforce" because "neither Title IX nor its implementing regulations define 'sex'". Commissioner's Order at 5. "Sex" under Title IX unequivocally means biological sex.

### A. Legal Standard

To obtain a TRO, a party must show that "irreparable injury is likely in the absence of an injunction." *Winter*, 555 U.S. at 20. In this Circuit, irreparable harm is injury "neither remote nor speculative, but actual and imminent, and [one that] cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (cleaned up). When a party faces the Hobson's choice of choosing between following a government directive or risking loss of funding, that dilemma itself constitutes irreparable injury that money damages cannot remedy. *See Metro. Transp. Auth. v. Duffy*, 784 F. Supp. 3d 624, 693 (S.D.N.Y. 2025) (explaining that "[c]ourts have repeatedly recognized the irreparable harm inherent to" the Hobson's choice where a party can either accede to a government threat or risk loss of funding) (collecting cases).

### B. Compliance With the Commissioner's Order Will Violate Title IX and Threaten the District's Federal Funding

Although Title IX does not require sex-separated facilities in all circumstances, the "notion that the protection of individual privacy will occasionally require some segregation between the sexes is beyond doubt." *Adams*, 57 F.4th at 804. The federal government accordingly brings Title IX enforcement actions when schools fail to exercise their authority to provide sex-separated facilities in the proper circumstances (e.g., when school conditions and dynamics present a risk of sex-based harm). As made clear in its letter to the District's counsel, the United States views the conditions here as one such circumstance where "allowing boys . . . to enter intimate spaces designed for girls harms girls and accordingly violates Title IX." Rigano Decl. Ex. H at 2. By following the Order, the District therefore risks forfeiting millions of dollars in education funding on which its students depend.

### 1. Federal Enforcement Against Districts With "Gender Identity" Policies Is Already Underway

The DOJ letter notes that "the United States' recent Title IX court enforcement actions regarding boys in girls' sports and boys in girls' intimate spaces (such as locker rooms and bathrooms) show that the United States does not appear to be adverse to your clients' legal positions." Rigano Decl. Ex. H at 1-2. In that letter, the DOJ made the federal government's position unmistakable, declaring that "allowing boys, including trans-identifying boys, to enter intimate spaces designated for girls harms girls and accordingly violates Title IX." *Id*. at 2. The DOJ further stated that "pursuant to the Supremacy Clause . . . for educational programs that accept federal funding, Title IX would preempt any state or local law or regulation that directly conflicts with Title IX." *Id*. at 3.

The letter also identifies active enforcement against districts that adopted the policy the Order compels: Denver Public Schools was investigated and found in violation for allowing gender-identity-aligned bathroom use; five Northern Virginia school districts were found in violation and designated high risk, resulting in federal funding restrictions; and Kansas school districts remain under investigation. *Id.* at 2.[4] In New York, USDOE has launched an investigation into Bellmore-Merrick Central High School District on Long Island, Saratoga Springs and threatened to withhold funding from the New York City school system. Supp. Am. Compl. ¶ 2 n.1.[5]

---

[4] *See also* https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-finds-denver-public-schools-violated-title-ix; https://www.ed.gov/about/news/press-release/us-department-of-education-finds-five-northern-virginia-school-districts-violation-of-title-ix; https://www.ed.gov/about/news/press-release/us-department-of-education-launches-investigations-four-kansas-school-districts-alleged-title-ix-ferpa-violations.

[5] *See* https://www.ed.gov/about/news/press-release/us-department-of-educations-office-civil-rights-initiates-18-title-ix-investigations

### 2. The Funding at Stake Feeds the District's Students and Supports Students with Disabilities

Noncompliance with Title IX risks termination of federal funding under 20 U.S.C. § 1682, which would constitute irreparable harm. "Complying with a regulation later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring); *accord Tennessee*, 737 F. Supp. 3d at 566 (applying *Thunder Basin* to find irreparable harm from "sweeping policy changes [states] are required to implement" in a "short timeframe").

The Ruf Declaration details the consequences of flouting Title IX. Ruf Decl. ¶¶ 2–11. The District receives millions of dollars annually in federal funding—the difference between feeding its students and meeting its legal obligations to children with disabilities and being unable to do so. Losing that funding would require "difficult and potentially significant reductions to programs, staffing, and services that are fundamental to the District's operations." Ruf Decl. ¶¶ 9, 8-11.

Federal funding provides hundreds of thousands of dollars for the District's Food Service Program. If lost, the District "would be required to significantly reduce food service expenditures," which "could ultimately jeopardize the district's ability to operate the food service program at its current level." Ruf Decl. ¶ 4. Nearly two million dollars supports special education programs, including "critical support for 12 special education staff members whose positions are integral to the district's ability to meet its obligations under students' Individualized Education Programs ('IEPs')." Ruf Decl. ¶¶ 5–6. Losing this funding would "have a direct and substantial impact on the district's ability to maintain required special education staffing and services." Ruf Decl. ¶ 7.

The District also receives millions of dollars in state aid needed for its operations. Ruf Decl. ¶ 12. Losing either federal or state aid would have dire consequences.

### C. The District Faces an Impossible Choice: Lose Federal Funding or Lose State Funding

The Order places the District in a regulatory vise: every path leads to loss of funding students need. *See Metro. Transp. Auth.*, 784 F. Supp. at 690-93 (finding irreparable harm where New York faced a loss of state revenue if it followed the federal government's demands or the loss of federal funding if it did not do so). With the school year approaching and the DOJ's position now explicit, time is of the essence.

The District cannot satisfy both commands. Complying with the Order by opening female locker rooms to biological males would violate Title IX and risk federal enforcement and the federal funding on which its Food Service Program and 12 special education staff positions depend. Following Title IX and maintaining facilities separated by biological sex would violate the Order and risk state enforcement and the state funding needed to operate. The District operates on a narrow budget and needs both sources to provide legally required services. *See supra* Section II.B; Ruf Decl. ¶¶ 2–12.

State officials have expressly threatened "enforcement actions" if the District maintains facilities separated by biological sex.

Conversely, the DOJ's August 20, 2026 letter states that the federal government views the policy compelled by the Order as a Title IX violation, and USDOE has investigated and imposed penalties on districts nationwide, including in New York, for adopting identical policies. Supp. Am. Compl. ¶ 2.

Because the District cannot comply with both sovereigns or budget for the coming year without knowing which funds it will lose, that uncertainty is itself irreparable harm. *See County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 537 (N.D. Cal. 2017). Absent a TRO, the District must choose between federal and state funding; there is no third option.

### D. Loss of State Funds Cannot Be Restored Under Any Circumstances

#### 1. Sovereign Immunity Forecloses Recovering Improperly Withheld Funds From New York State

The Eleventh Amendment bars an award of retroactive monetary relief payable from the State treasury. *Edelman v. Jordan*, 415 U.S. 651, 663, 668 (1974). Plaintiffs' claims proceed under *Ex parte Young*, 209 U.S. 123 (1908), which permits prospective relief only. If the State withholds aid from the District during the pendency of this action and Plaintiffs ultimately prevail, this Court cannot order the State to pay the withheld funds back. A remedy that arrives at final judgment is therefore no remedy at all as to money already lost.

#### 2. New York Law Forecloses Every Means of Replacing the Funds

The District could not make itself whole even prospectively. New York law closes each avenue in turn.

The District cannot raise the money because Education Law § 2023-a caps its tax levy at the prior year's levy multiplied by the lesser of 1.02 or one plus inflation, and exceeding that limit requires the approval of sixty percent of the voters. *Id.* § 2023-a(6).

The District cannot appropriate the money mid-year because "[n]o board of education shall incur a district liability in excess of the amount appropriated by a district meeting." *Id*. § 1718(1). The 2026 to 2027 appropriation is fixed, and the next annual meeting is in May 2027.

The District could not have reserved against the loss. Real Property Tax Law § 1318(1) defines surplus funds as operating funds exceeding four percent of the current year budget and requires the excess to be applied against the levy. The District's remaining reserves are restricted by statute to capital, retirement, and similar dedicated purposes. Gen. Mun. Law §§ 6-c, 6-d, 6-r; Educ. Law § 3651; Ruf Decl. ¶¶ 13-15.

Nor can the District shed the corresponding expense. Federal law bars a local educational agency from reducing local expenditures for special education below the preceding year's level, 20 U.S.C. § 1413(a)(2)(A)(iii); 34 C.F.R. §§ 300.203 to 300.205, and the obligations in each student's individualized education program remain regardless, Educ. Law § 4402.

The result is a closed loop: the District cannot levy or appropriate for the loss, draw on reserves, or cut the services the funding supports. Whatever is taken is gone.

## III. The Balance of the Equities and the Public Interest Favor Relief.

Where the government is a party, the balance of equities and public interest factors merge. *New York v. U.S. Dep't of Homeland Sec.*, 969 F.3d 42, 58–59 (2d Cir. 2020).

### a. The Injunction Restores the Status Quo.

The injunction Plaintiffs seek would restore the status quo that has prevailed throughout the District's history: intimate facilities separated by biological sex, with gender-neutral bathrooms available at every school for any student who wishes to use one. Maintaining that status quo is the primary purpose of emergency relief. *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("[T]he purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir. 2004). The Order—not the District's Resolutions—is the disruptive act, and the relief sought simply preserves the longstanding arrangement while the merits are resolved.

### b. Denying Emergency Relief Would Subject Girls to the Violation of a Fundamental Constitutional Right.

The right at stake is grounded in the Constitution, not in policy preference. The Sixth Circuit has held that students possess a Fourth Amendment privacy interest in their unclothed bodies, including "the right to shield one's body from exposure to viewing by the opposite sex."

*Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 494 (6th Cir. 2008); *see also York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963).

Courts have consistently upheld the separation of intimate facilities by biological sex to protect this right. *See Roe v. Critchfield*, No. 23-2807, slip op. at 21–22 (9th Cir. Mar. 20, 2025); *Carcano v. McCrory*, 203 F. Supp. 3d 615, 641 (M.D.N.C. 2016). In the related context of school sports, the Supreme Court confirmed that sex-based classifications serve important governmental interests. *W. Virginia*, 146 S. Ct. at 2375. That significance is sharpest in school locker rooms—spaces "not notable for the privacy they afford," *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 657 (1995)—where adolescent girls have no choice but to undress.

Where an injunction would prevent the deprivation of constitutional rights, the equities necessarily favor relief. The government "is in no way harmed by issuance of a preliminary injunction which prevents [it] from enforcing restrictions likely to be found unconstitutional." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 346 (4th Cir. 2021) (en banc).

### c. The Record Confirms That Denying Relief Will Cause Irreversible Harm to the District's Students

The harm the Order will inflict is not theoretical. In *Doe v. Cabarrus County Board of Education*, No. 1:26-cv-00752 (M.D.N.C. Aug. 10, 2026), three female high-school students experienced repeated encounters with biological males in restrooms and locker rooms, causing "distress, anxiety, humiliation, and loss of privacy"—one stopped using restrooms entirely; another quit athletics altogether. In *Kansas v. United States Dep't of Educ.*, 739 F. Supp. 3d 902 (D. Kan. 2024), a middle school girl "remarkably refused to use the restroom at school" after encountering biological males there. In *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 528 (E.D. Ky. 2024), a fifteen-year-old was "prompted . . . to change clothes elsewhere" when a biological male was permitted to use the girls' locker room.

Every one of those harms has already occurred in Massapequa. For the first time, at the beginning of the 2025-26 school year, biological males entered the girls' locker rooms, and female students reported harassment and invasions of privacy. Wachter Decl. ¶ 7; Supp. Am. Compl. ¶ 81. That September, the District immediately passed the Resolutions clarifying its historical across-the-board bathroom and locker room policy and directed enforcement. After the Resolutions took effect, those incidents ceased. Wachter Decl. ¶ 10; Supp. Am. Compl. ¶ 83. When Commissioner Rosa issued her stay order, the harm returned—"a biological male proceeded to use the girls' bathroom and locker room in 2025, and there were additional complaints from students throughout the year." *Id.* at 84; see Wachter Decl. ¶ 13. At the October 9, 2025 BOE meeting, R.H., a biological female student who attended the same school as Janie Doe, stated that she had "never been more uncomfortable in [her] life" sharing a bathroom with a biological male and her "[f]riends do not change for gym now because they are so scared". Board Meeting, Oct. 9, 2025, at 1:00:08–1:01:33, https://www.youtube.com/watch?v=qDDQ0osUdA4.

The federal government has recognized the severity of this harm. USDOE acknowledges that "requiring women to undress or use the bathroom in the presence of men causes distress in women, violates their right to privacy, and can deny women equal access to benefits of education programs and activities." Supp. Am. Compl. ¶ 87. In its enforcement action against Fairfax County Public Schools, USDOE found that female students were subjected to a male student who "made sexual jokes, momentarily touched other students in an inappropriate manner, and watched female students changing in the locker room." *Id*. at ¶ 89. The Order would produce the same results in Massapequa—harms that, once inflicted, cannot be undone.

**d. The Public Interest Favors Compliance with Federal Law**

"[T]here can be no doubt that the public interest favors requiring the government to comply with the law." *Velesaca v. Decker*, 458 F. Supp. 3d 224, 241 (S.D.N.Y. 2020). There is "generally

no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C. v. U.S. Dep't of Health & Hum. Servs.*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018). The public interest favors protecting schoolchildren's bodily privacy in compliance with Title IX and preventing a state official from forcing a school district to choose between incompatible legal obligations.

### IV. This Court Should Exercise Its Discretion to Waive FRCP 65(c)'s Security Requirement.

Finally, Plaintiffs ask the Court to waive Rule 65(c)'s security requirement under its "wide discretion" to "dispense with the bond requirement." *Doctor's Assocs., Inc. v. Distajo*, 107 F.3d 126, 136 (2d Cir. 1997) (internal quotations omitted). A district court need not require a bond where, as here, "there has been no proof of likelihood of harm" to Defendants and the restraint will cause no material damage. *Id.* Further, the District is a municipal entity and cannot divest its assets.

## NOTICE

This application is made on notice. On August 28, 2026, undersigned counsel spoke by telephone with Helena Lynch, counsel of record for State Defendants, and immediately thereafter followed up with an email to advise Ms. Lynch that Plaintiffs would file this application and to ask about her availability for a hearing before the Court. Ms. Lynch advised that she is on vacation until noon on September 1, 2026 and will be available thereafter. Ms. Lynch advised that she prefers such conference proceed virtually or telephonically. Ms. Lynch responded to that email copying Matthew Faiella of the Attorney General's Office asking that Mr. Faiella be copied on correspondence going forward. Plaintiffs' counsel will send all filed motion papers by email to both Ms. Lynch and Mr. Faiella immediately after their filing and will appear in person, virtually or telephonically at the Court's convenience. Plaintiffs are prepared to proceed on any schedule the Court directs, including on shortened notice.

## CONCLUSION

For the reasons stated herein, Plaintiffs' motion for a temporary restraining order and preliminary injunction should be granted.

Dated this 1st day of September 2026.

Respectfully submitted,

By: *Susan L. Greene*_______
Susan L. Greene
NY Bar No. 4687349
sgreene@holtzmanvogel.com
Jonathan Jaroslawicz
jjaroslawicz@HoltzmanVogel.com
HOLTZMAN VOGEL BARAN
TORCHINSKY & JOSEFIAK
1325 Avenue of the Americas
Suite 2843
New York, NY 10019
Phone: (646) 792-9288

Rigano LLC Nicholas C. Rigano, Esq.
534 Broad Hollow Road
Suite 100
Melville, New York 11747
(631) 756-5900
nrigano@riganollc.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF COMPLIANCE**

I certify that the above Memoranda of Law complies with the formatting requirements and word and page count limitations, pursuant to Local Civil Rule 7.1(b) and Rule IV(C) of Your Honor's Individual Practices.

/s/ *Susan L. Greene*